**United States Federal District Court**
**For the State of Maryland**
**Civil Division**

| | |
|---|---|
| United States of America ex rel.,<br>Sandeep Gopalan<br>1201 Patridge Lane<br>Winston Salem, NC 27106<br>Relators,<br><br>    vs.<br><br>University of Maryland Eastern Shore<br>Heidi M. Anderson<br>30665 Student Services Center<br>Princess Anne, MD 21853<br>Defendants. | )<br>)<br>)  Case No. ___26-cv-2468___<br>)<br>)  Jury Demand.<br>)  For violations of the Federal False Claims<br>)  Act, 31 USC §3729 et seq.<br>)<br><br>FILED UNDER SEAL pursuant to<br>31 U.S.C. §3730 (b)(2) |

## Introduction

The Relator/Plaintiff Sandeep Gopalan, D.Phil., by and through his undersigned counsel, Dhali PC, and on behalf of the United States of America, brings this action under the False Claims Act, 31 U.S.C §3729 et seq., against the Defendants the University of Maryland Eastern Shore (UMES) and its President, Heidi M. Anderson.

Gopalan was the interim Vice President (VP) for Research, VP for Academic Affairs and a tenured professor at UMES. He has been employed in this position since 2023 and is currently a tenured professor at UMES. In December 2023, Dr. Gopalan founded the "Futures Institute" within UMES. The purpose of the Futures Institute was to engage in interdisciplinary research in the areas of artificial intelligence, climate change and health outcomes. To that end, in 2024, the U.S Department of Education awarded UMES a $4.6 million grant to fund the Futures Institute.

Sometime in 2023, Gopalan, the 'original source' discovered that UMES were inflating student enrollment numbers, engaging in organized, systematic civil rights violations, and falsely certifying compliance under the Higher Education Act (HEA), 20 U.S.C. §1001 et seq., to receive federal funds. Gopalan estimates that UMES defrauded the U.S. Department of Education of about $196 million dollars.

Additionally, in late 2023 or early 2024, Dr. Gopalan also informed UMES that they were not incompliance with the Higher Education Act's mandatory requirements and that iPads purchased from a U.S. Department of Education federal grant for use by minority students were being misappropriated by the UMES staff.   In June and September 2024, Dr. Gopalan also filed complaints of race and national origin discrimination and illegal behavior by UMES staff with the Maryland Attorney General, and other state and federal parties, including corroborating evidence of organized civil rights violations substantiated by faculty surveys.  He also complained about illegal behavior in December 2024 and throughout 2025.

The retaliation by UMES was swift and immediate. In January 2025, UMES terminated Dr. Gopalan's $4.6 million grant for the Futures Institute cancelled the contracts and scholarships of researchers funded by the Futures Institute, and shut the research activities down.

Consequently, an action for the violation of the laws now follows.

### Part I. Parties.

1.  The Plaintiff/Relator Sandeep Gopalan is a tenured professor with the Defendant and brings this action on behalf of the United States of America, acting on behalf of the

U.S Department of Education (DOE). The DOE provided federal funding to the Defendant, the University of Maryland Eastern Shore solely based on Defendants' false certifications.

2. The Defendant, University of Maryland Eastern Shore is an institution of higher learning within the University System of Maryland (USM).

3. Heidi M. Anderson is the President of UMES and is also being sued in her individual capacity for claims under the FCA.

## Part II. Jurisdiction & Venue

4. This Court has jurisdiction under 31 U.S.C §3729 et seq., of the federal False Claims Act (FCA) and also under 28 U.S.C §1331.

5. Venue is also proper in Maryland, because the Defendants transact business in Maryland.

## Part III. Statement of Facts

6. Title IV of the Higher Education Act (HEA) 20 U.S.C. §1001 et seq., requires recipients of federal funds and dollars to keep accurate records concerning student enrollments. The HEA also provides student assistance funds to the Defendant.

## The Higher Education Act (HEA) of 1965.

7. Pursuant to Title IV of the HEA of 1965, 20 U.S.C. §§ 1070 et seq., the U.S Department of Education (DOE) provides financial assistance in the form of grants, loans, loan guarantees and interest subsidies to eligible students to help defray the costs of education, including, but not limited to, the Federal Perkins Loan Program, 20 U.S.C.

§ 1087aa et seq., 34 CFR § 674 and the Federal Direct Student Loan Program, 20 U.S.C. §§ 1087a et seq., 34 CFR § 685.

8. To maintain its eligibility to receive Title IV funds, UMES enters into program participation agreements (PPAs) with the DOE indicating compliance with all laws. See generally 20 U.S.C §1094.  UMES is also required to certify compliance under Title IX of the of The Education Amendments of 1972, 20 U.S.C §1681 et seq., and Title VI of the 1964 Civil Rights Act, 42 U.S.C §2000 et seq as a condition to receive federal funds.

9. To maintain eligibility to receive funds, Defendants have to certify compliance with civil rights laws including Title VI, VII, and Title IX in its E-App filings and recertifications.

10. To maintain its eligibility to receive Title IV funds, the institution must also submit annual compliance audit and financial statements prepared by independent auditors. 20 U.S.C. § 1094(c); 34 C.F.R. §§668.23 and 668.25.  The audit reports are used to determine whether schools are adhering to applicable requirements for funding. As part of the audit, UMES must certify compliance with federal laws.

11. Congress has specifically prohibited educational institutions from using deceptive practices, including misrepresentations which concern the nature of a school's "financial charges." Among the specified prohibited conduct, an institution shall not engage in false, erroneous or misleading statements concerning enrollment and other student benefits. Under 20 U.S.C §1092, UMES is also required to capture accurate student enrollment data.

12. Title IV of the HEA and the related regulations requires that an educational institution require, in its contract with the servicer, compliance with all statutory provisions of or applicable to Title IV of the HEA, all regulatory provisions prescribed under that statutory authority, and all special arrangements, agreements, limitations, suspensions, and terminations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement to use any funds that the servicer administers under any Title IV, HEA  program and any interest or other earnings thereon solely for the purposes specified in and in accordance with that program.  An institution also is required to include in its contract with the servicer, the servicer's agreement to report to the government violations of the law.

13. With respect to all Title IV programs, the disbursement of federal funds rests on required statements of eligibility made by schools that were necessary for requests for payment to be considered. By signing their PPAs, the Defendant Institutions each acknowledged their responsibilities to act as fiduciaries, to comply with all Title IV program requirements and to account for the federal funds entrusted to them.

14. As a 1980 Land Grant institution, UMES must also sign and submit **Form USDA AD-1023** (Assurances Regarding Compliance with Civil Rights Requirements). This legally certifies that the university operates its agricultural research, teaching, and extension programs without discrimination based on race, color, national origin, sex, age, or disability.

15. Relatedly, UMES is also required to file SF-424 and SF-424B, Assurances of Compliance, verifying compliance with civil rights laws.

16. The above certifications are made by Heidi Anderson and the federal government's provision of funding is entirely dependent on those certifications.

17. UMES would not receive federal funds but for these certifications.

**UMES' Participation in HEA Title IV Programs.**

18. The Defendant UMES signs and submits PPAs to the DOE, thereby certifying their compliance with the program, their future compliance with all applicable statutory and regulatory provisions, and compliance with the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program. The Defendant Institutions additionally certify that they have reported accurate enrollment figures, and that all federal funds are used for the intended purposes.

19. UMES is currently operating under approved PPAs and cannot, in fact, operate in the Title IV environment without a current PPA.  As a matter of law, each Defendant Institution is deemed to be operating under a PPA.  See 20 U.S.C §1094 and 34 CFR § 668.14. Each submits a variety of claims to the government for Title IV funds that it knows to be false. During each academic year starting 2020 through 2026 the Defendant secured enrollments in their programs and received Title IV funds for students enrolled in their programs. Additionally, during each academic year starting 2020 to 2026, students obtained loans guaranteed by the government, or in some cases, financial aid directly from the government.

20. To that end, in Fall 2020, UMES reported a total undergraduate enrollment number of 1860.[1]

21. in Fall 2021, UMES reported a total undergraduate enrollment of 1619.[2]

22. In Fall 2022, UMES reported undergraduate enrollment of 1749.

23. In Fall 2023, UMES reported total undergraduate enrollment of 2059.[3]

24. In Fall 2024, UMES reported a total undergraduate enrollment of 2263.[4]

25. In Fall 2025, UMES reported a total undergraduate enrollment of 2695.[5]

26. Gopalan contends that all of these enrollment numbers were falsely certified to the DOE.

**Facts Relevant to this Case.**

27. The Plaintiff Dr. Sandeep Gopalan is a tenured professor at the University of Maryland Eastern Shore (UMES).  Dr. Gopalan obtained his graduate and doctoral degrees (D.Phil.) in law from the University of Oxford (England) as a Rhodes Scholar.

28. In January 2023, Dr. Gopalan began his employment as the Vice Provost for Academic Affairs for UMES.

29. While at UMES Dr. Gopalan procured over $5 million in research grants. As of December 2025, a further $20 million in research grant applications were under review at federal grant agencies. Gopalan established collaborations with world-

---

[1] https://nces.ed.gov/ipeds/reported-data/163338?year=2020&surveyNumber=15
[2] https://nces.ed.gov/ipeds/reported-data/html/163338?year=2021&surveyNumber=15&viewmode=print
[3] https://nces.ed.gov/ipeds/reported-data/163338?year=2023&surveyNumber=15
[4] https://nces.ed.gov/ipeds/reported-data/163338?year=2024&surveyNumber=15
[5] https://app.powerbi.com/view?r=eyJrIjoiMzI1NGQyYTctNmUzNy00ODEzLWFjZmEtYmMwY2I4Mzk5MmU1IiwidCI6ImYzYjc0YzZiLWFmMTMtNDg1MC05N2YwLTJlOTdhOGE5YjdkNyIsImMiOjF9

renowned researchers at Princeton, Yale, the University of Pennsylvania and the U.S Naval Research Laboratory for these grants.

**The Enrollment Scam: (A) Summer Bridge**

30. President of UMES, Heidi Anderson, and the Defendants designed and implemented a highly sophisticated enrollment scam to defraud the US government of tens of millions of dollars for their personal gain.

31. Anderson and Defendants preferentially enrolled African-American phantom or "ghost students," to artificially inflate UMES' student enrollment numbers to obtain funds for each phantom/ghost student.

32. From 2023-2026 Anderson and Defendants operated a Summer Bridge program to register about 150 African-American fake students each year who did not possess the required entry qualifications for university education.

33. Moreover, Anderson implemented an overall race-based recruitment practice to ensure that 80% of all students were Black, that the majority of UMES employees were Black, and awarded Blacks discriminatorily preferential promotions and pay.

34. In reality, the Summer Bridge was a scam and there was no preparatory academic work to enable these fake students to gain the necessary qualifications for university admission.

35. Anderson and Defendants intentionally enrolled these Summer Bridge 'students' into regular university courses in August each year with full knowledge that they did not possess the admission requirements and should not have been enrolled under applicable law.

**The Enrollment Scam: (B) Phantom students**

36. Under the HEA and federal law relating to the administration of financial aid, UMES is required to track attendance of students and drop students who do not attend courses.

37. Per the federal financial aid regulations, UMES is required to track students who stopped attending classes and require them to repay a portion of the federal financial aid for that semester.  As explained by the DOE, a university "is required to determine the earned and unearned portions of Title IV aid as of the date the student ceased attendance based on the amount of time the student spent in attendance or, in the case of a clock-hour program, was scheduled to be in attendance."[6] Further, "a student who withdraws after the 60% point-in-time, there are no unearned funds. However, a school must still determine whether the student is eligible for a post-withdrawal disbursement (PWD)."[7] And, finally, "student who is no longer enrolled and in attendance is no longer eligible for in-school status or an in-school deferment, so the school must report the student's enrollment status as withdrawn ("W") in NSLDS (National Student Loan Data System) Enrollment Reporting."[8]

38. UMES is required to track and cancel the financial aid of students who never began attendance in some or all classes.

---

[6] https://fsapartners.ed.gov/knowledge-center/fsa-handbook/2025-2026/vol5/ch1-general-requirements-withdrawals-and-return-title-iv-funds
[7] Id.
[8] Id.

39. Pursuant to 34 CFR 34 section-685.30 () "a school must notify the Secretary within 30 days after the date the school discovers that:

(i) A loan under title IV of the Act was made to or on behalf of a student who was enrolled or accepted for enrollment at the school, and the student has ceased to be enrolled on at least a half-time basis or failed to enroll on at least a half-time basis for the period for which the loan was intended."

40. Pursuant to 34 CFR 668.24 (a) (3), a university has to maintain records of "Its administration of the title IV, HEA programs in accordance with all applicable requirements;". Further, the provision mandates these as "required records" under (c): "***Required records.***

(1) The records that an institution must maintain in order to comply with the provisions of this section include but are not limited to—

(i) The Student Aid Report (SAR) or Institutional Student Information Record (ISIR) used to determine eligibility for title IV, HEA program funds;

(ii) Application data submitted to the Secretary, lender, or guaranty agency by the institution on behalf of the student or parent;

(iii) Documentation of each student's or parent borrower's eligibility for title IV, HEA program funds;

(iv) Documentation relating to each student's or parent borrower's receipt of title IV, HEA program funds, including but not limited to documentation of—

(A) The amount of the grant, loan, or FWS award; its payment period; its loan period, if appropriate; and the calculations used to determine the amount of the grant, loan, or FWS award;

(B) The date and amount of each disbursement or delivery of grant or loan funds, and the date and amount of each payment of FWS wages;

(C) The amount, date, and basis of the institution's calculation of any refunds or overpayments due to or on behalf of the student, or the treatment of title IV, HEA program funds when a student withdraws; and

(D) The payment of any overpayment or the return of any title IV, HEA program funds to the title IV, HEA program fund, a lender, or the Secretary, as appropriate;"

41. 34 CFR section 668.24 also mandates UMES to retain the following: "(v) Documentation of and information collected at any initial or exit loan counseling required by applicable program regulations;

(vi) Reports and forms used by the institution in its participation in a title IV, HEA program, and any records needed to verify data that appear in those reports and forms; and

(vii) Documentation supporting the institution's calculations of its completion or graduation rates under §§ 668.46 and 668.49.

42. These federal regulations designed to ensure that only genuine students who are enrolled in, and actively engaged with, academic activity receive federal funds has been obstructed in a highly sophisticated and organized manner by Anderson and Defendants.

43. First, the attendance monitoring system has been rendered inoperable and a deliberate setting of "attended" has been installed to falsely show that students attend classes even though they do not actually do so.

44. Faculty who actually teach the courses have been prevented from changing this setting of "attended" for students who actually do not attend.

45. In effect, Anderson is administering and implementing a fiction of all students attending all courses.

46. Even when faculty notify the Registrar, that students should be administratively dropped pursuant to applicable law for non-attendance, the Registrar refuses to drop those students.

47. Anderson has implemented a scheme to prevent the tracking of students who do not show up (other than in the course roster) and drop students because that is against her personal benefit to collect a high pay by showing an artificially inflated enrollment number.

**The Enrollment Scam: (C) Duplicate Course Enrollment**

48. Anderson and Defendants are operating a sophisticated fraud scheme whereby they enroll students in duplicates of the same course for nefarious purposes. A student is simultaneously enrolled in two courses for the same subject matter and content: one as an in-class course and the other as an "independent study" course.

49. The purpose is simple: in the event that an honest faculty member insists on administratively dropping the enrolled student from the in-class course for not attending classes, submitting assignments, or passing exams, Anderson's cronies

"withdraw" the student at the end of the semester and give a fake grade in the "independent study" to dupe the federal government.

50. In reality, there is no "independent study" and such independent studies are impermissible for students who do not meet academic eligibility requirements. The courses are a sham.

**The Enrollment Scam: (D) Testing Center**

51. Anderson and Jason Casares, (Assistant Vice President for Institutional Equity, Diversity, and Compliance) operate a "Testing Center," and encourage students to do their exams at that location rather than the university's normal exam locations.

52. Anderson's "Testing Center" is an organized cheating center where students are enabled to copy and cheat on exams. Faculty have reported cheating at the center and video evidence has confirmed this; but Anderson operates the Center anyway for personal gain.

**The Enrollment Scam: (E) Fake Courses and Fake Grades**

53. Anderson and Defendants have created fake courses and awarded fake grades for students in brazen violation of federal laws and accreditation standards.

54. Students who fail courses are then "enrolled" in fake winter and summer courses where they are automatically given pass grades despite there being no teaching and learning activities,

**The iPad Scam**

55. In 2023,UMES was awarded a multi-million dollar grant by the Office of Minority Broadband Initiatives within the Department of Commerce.

56. Anderson gave the grant to Urban Wiggins,[9] the Vice Provost for Decision Science and Visualization in the Office of Academic Affairs at UMES, in exchange for his cooperation in certifying false enrollment data to the US Department of Education.

57. Urban Wiggins, Vice-Provost, is the responsible official for reporting enrollment data in Integrated Postsecondary Education Data System (IPEDS), and a vital cog in implementing the phantom-student enrollment scam

58. Wiggins used the grant money to buy over 2000 iPads and distributed these iPads to Anderson, Allen, and their friends and family members.

59. Despite UMES' student population being poor minorities, Wiggins, Allen, and Anderson did not distribute any of the 2000 iPads to students for the period of March 2024 to October 2025.

60. For a full period of over 18 months, these iPads remained unused.

61. In October 2025, Wiggins handed the iPads to students who promptly unloaded them on to the market and sold them at rock-bottom prices.

62. Anderson, Allen, and Wiggins' actions cost the US government over $2 million.

**The Title III Scam**

63. Pursuant to Title III of the Higher Education Act of 1965 (HEA), UMES receives grants from the US government for improvements to academic programs, student services, institutional management, and improve financial stability.

---

[9] https://wwwcp.umes.edu/dsv/dr-urban-wiggins/

64. Instead of using the funds for these purposes, Anderson has used the funds to pay her friends as "consultants" for routine functions already performed by UMES staff or faculty, and to bribe her cronies with foreign travel under the guise of study tours.

65. In reality, these "study tours" are personal holidays enjoyed by Anderson or her friends to tourist locales with one or two students in tow to dupe the government.

66. Amongst the "consultants" hired by Anderson, was Lance Lucas, a convicted felon who had paid bribes for securing similar contracts.[10] Gopalan reported this contract to the USM Board of Regents and the Maryland Governor's Office but was ignored.

67. In December 2023 and early 2024, Dr. Gopalan noticed that UMES were exaggerating its student enrollment figures. UMES were submitting false certifications on student enrollments to DOE. Student enrollments are submitted via the "Integrated Post Secondary Education Data System," (IPEDS).[11] Over a period of years, in reliance on the Defendant's false and fraudulent agreements and promises, the DOE paid out tens of millions of dollars in student grants and federal dollars, all used for tuition payments. Each of these requests for payment of such funds constitutes actionable false claim under the FCA. Each dollar paid or guaranteed to be paid by the DOE constitutes a loss to the government.

68. For instance, in May 2024, Dr. Gopalan learned that shortly after taking office as president in 2018, Anderson began reporting fake enrolment and retention data from 2020 onwards to the DOE.

---

[10] https://www.justice.gov/usao-md/pr/baltimore-businessman-lance-lucas-sentenced-18-months-federal-prison-honest-services-wire

[11] https://nces.ed.gov/ipeds

69. Anderson's motive for submitting the false enrollment data reports was to retain her job in the face of mounting complaints about her work performance and serious allegations of misconduct, and to collect pay increases based on the deceptive narrative of enrollment growth. These fake enrollment and student outcomes data have been submitted to the federal government for the last 6 years from 2020 to 2026.

70. For instance, in Fall 2024 or September 2024, about 800 out of the supposed enrolment of 3000 students had not paid fees and were nonresponsive to communications. These students were also no longer on campus.

71. These 800 students should have been dropped from the enrollment record pursuant to HEA guidelines and regulations. Instead, Anderson sometime in September 2024 transferred funds to falsely make it appear that these students were still enrolled as fee paying students. This is a complete mismanagement of public funds contrary to the law and an intentional falsehood to the DOE and the U.S government.

72. Dr. Gopalan estimates that the federal government paid out financial aid, loans, USDA Land Grant funds, institutional aid, and other funds based on a cost of attendance of about $29,000 per year for each student. The Relator is approximating $196 million in fraudulent funds from the federal government including the USDOE and USDA by UMES for the years 2020-2026 (combination of $12 million in institutional grants, $151,334,500 in federal aid, and $36 million in land grant appropriations).

73. In December 2023, Dr. Gopalan founded the "Futures Institute," to conduct inter-disciplinary research in the field of artificial intelligence, climate change and

sustainability, and health care outcomes.[12] The Institute was funded by a $4.68 million competitive grant from the U.S Department of Education.

74. In 2024 nine (9) doctoral (Ph.D) students at UMES received their scholarship from the Futures Institute. These students were some of the best and brightest doctoral candidates. UMES has historically struggled to attract good doctoral candidates because of their low academic ranking.

75. In 2024 these 9-students were interviewed and selected by various faculty and department heads at UMES and were going to be working in the areas of cancer research, environmental pollution and artificial intelligence (AI) among others.

76. In January 2024 Dr. Gopalan was offered the role of Provost at a prestigious, highly ranked university. Dr. Gopalan declined the offer in exchange for being promoted to Vice President of Research (VPR) at UMES.

77. In February 2024, Dr. Gopalan began his duties as the Vice President of Research at UMES.

78. In March 2025, UMES was due for its Middle State Commission on Higher Education (MSCHE) accreditation reaffirmation site-visit. As part of its re-accreditation process, UMES had to submit a compliance report meeting MSCHE guidelines by January 2025.

79. Dr. Gopalan was central to the re-accreditation process because he was the Accreditation Liaison Officer to the MSCHE.

---

[12] https://wwwcp.umes.edu/pr/umes-receives-4-6m-research-grant-from-u-s-dept-of-education/

80. While working on the re-accreditation process and finalizing the self-study report for submission to MSCHE, Dr. Gopalan noticed serious compliance issues with governance, assessment outcomes, and data integrity. Gopalan flagged these issues with the UMES Provost and Heidi Anderson.

81. Curiously, from the start of Anderson's tenure at UMES in 2018 until 2023, there was no assessment data at all. The data would have validated and corroborated the enrollment numbers and their absence exposes the enrollment data as empty numbers because there is no evidence of student assessment indicating that these students are not "phantoms."

**Protected Activity.**

82. In late 2023 and on several instances in 2024, Dr. Gopalan informed Provost Rondall Allen and President Heidi Anderson that they were not in compliance with the accreditation guidelines under MSCHE and the DOE.

83. Also in early 2024, Dr. Gopalan learned that Allen and Anderson were embezzling iPads that were intended for poor students and instead providing them to the friends and families of Allen and Anderson.

84. These iPads were purchased under a grant issued by the U.S Department of Commerce.

85. In 2024, Dr. Gopalan became aware that the U.S Department of Commerce were conducting an active investigation into the illegal diversion of iPads by Allen and Anderson.  To that end, in October 2024, the U.S Department of Commerce issued a notice of non-compliance to UMES.

86. In 2024, Dr. Gopalan also became aware that both NASA and the U.S Department of Agriculture (USDA) had issued notices of non-compliance to Allen and Anderson.

87. In 2024, Dr. Gopalan informed both Allen and Anderson that they needed to be honest with federal investigators, and that they (Allen and Anderson) needed to follow the law, or there could be court or legal action.

88. Anderson reacted in a hostile manner and rather dismissively said, "I don't look good in orange."

89. In June 2024, Dr. Gopalan also sent whistleblower complaints and letters to the federal agencies; the Maryland Governor, the MD Attorney General's Office; and the Board of Regents of the University System of Maryland detailing the iPad fraud scheme.  In these letters, Dr. Gopalan also discussed discriminatory work practices.

90.  During a cabinet meeting in July 2024, Dr. Anderson informed the cabinet that she had been alerted into a whistleblower complaint against Allen and her (Anderson).

91. Also in July 2024, Anderson in a one-on-one meeting with Dr. Gopalan informed Dr. Gopalan that based on the words used in the whistleblower complaint, she (Anderson) had an idea who wrote the whistleblower complaint.

92. Immediately after this July 2024 conversation, Allen exhibited hostility towards Dr. Gopalan.

93.  In September 2024, Dr. Gopalan again engaged in protected activity by submitting whistleblower complaints to the US Department of Education, the USM Board of Regents, the Maryland Attorney General, and the Maryland Governor alleging illegal

activity, Title IX, Title VI violations, and maladministration on the part of Allen and Anderson. He provided corroborating evidence.

94. In September 2024, Dr. Anderson asked Dr. Gopalan if the doctorate students in the Futures Institute were Black. Dr. Gopalan informed Anderson that the students were selected on merit. Dr. Anderson reacted with hostility.

95. Again, in Fall 2024, Lakeisha Harris, a close friend of Anderson, asked Dr. Gopalan if the students in his program were Black. Again, Dr. Gopalan said that the students were chosen on merit. Like Anderson, Harris too displayed overt hostility.

96. As part of UMES' retaliatory actions Dr. Gopalan was also given the worst office of any cabinet member. UMES had dozens of vacant office space that were better than the office provided to Dr. Gopalan.

97. In December 2024, Dr. Gopalan again submitted complaints of illegal behavior to the Maryland Governor and Attorney General, Governor's Chief of Staff, Board of Regents and federal investigators about Allen and Anderson's embezzlement of federal funds, fraudulent reporting of student data to deceive the government and fraud in connection with physical plant and facilities. He provided  corroborating evidence.

98.  Also in December 2024, Dr. Gopalan wrote to Jay Perman, Chancellor at the University System of Maryland (USM), and told Perman to perform his legal duties and obligations and not participate in corruption.  Dr. Gopalan never heard back from Perman.

99. In another instance, also in December 2024, or December 7, 2024, Gopalan informed the regents and Board of the University of Maryland, that UMES were engaging in

<u>selective discipline</u> when UMES initiated a false charge of a hostile work environment against Gopalan based on an unsubstantiated and false allegations of a temporary worker. Gopalan had also previously reprimanded this worker for submitting false time sheets for payment by UMES.  In this December 7, 2024, letter to the Board, Gopalan stated how African-American staff such as Bobby Brown, Derek Dunn, Moses Kairo, Heidi Anderson, Heidi Anderson's husband, Rondall Allen, Urban Wiggins, Grace Namwanba, Gertrude Hairston, Beatrice Wright, William Talley, Prince Attoh, Emmanuel Acquah, Emmanuel Onyeozili, and others, were spared any discipline based on far worse infractions.

100. Based on UMES' policy of selective discipline, Gopalan asserts that UMES was falsely certifying compliance of non-discrimination under Title IX of the Education Amendments Act and Title VI of the 1964 Civil Rights Act.

101. In January 2025, the USM Audit staff confirmed that there was an active investigation into "potential criminal" activities at UMES.

102. Immediately afterwards and in retaliation for Dr. Gopalan's protected activities, from December 2024 until January 2025, Allen, Anderson, Jason Casares (Assistant Vice President for Institutional Equity, Diversity, and Compliance) and Dr. Moses Kairo[13] (Dean at the School of Agriculture and Natural Science), began conspiring to steal the $4.68 million grant from the U.S Department of Education awarded to the Futures Institute.

---

[13] https://wwwcp.umes.edu/extension/dr-moses-t-kairo/

**103.** Dr. Gopalan immediately reached out to the Department of Education (DOE) to block the transfer of the grant.

**104.** In January 2025, Anderson further retaliated against Dr. Gopalan by also terminating the admission of several Futures Institute students.

**105.** In February 2025, Anderson also informed the Futures Institute students that the program was being shut down by UMES. Anderson said that the Futures Institute was being shut down because of polices implemented by Donald Trump and the U.S Department of Education.

**106.** When in March-April 2025, Dr. Gopalan contacted the DOE, the DOE informed Dr. Gopalan that the grant to the Futures Institute was not withdrawn, and that the program was continuing.

**107.** The DOE sent the communication by email to Fagan Harris, Chief of Staff to Governor Wes Moore, the Maryland Lieutenant Governor, and several USM Regents by name and asked for the grant to be restored. This was ignored.

**108.** Also, it is very rare for cash strapped universities like UMES to unilaterally terminate a $4.68 million grant, when they (UMES) are struggling for finances and student recruitment.

**109.** Terminations of federal grants are subject to due process procedures under 2 C.F.R. §200.340. These federal grants are also covered under the IGNITE Act, Uniform Guidance, UMES policies and procedures, along with the Maryland education code.

110. Anderson was also aware that his premature termination of the $4.68 million grant from the DOE was in violation of federal and state laws, including UMES' internal procedures and protocol.

111. The termination of funding from the Futures Institute resulted in harmful consequences for the 9-doctoral students in this program. Each of these 9-students received a full tuition waiver for 4-years and a $34,000 research assistantship also for 4-years. Several researchers moved to UMES solely on account of the guaranteed $4.6 million grant from the DOE, and who were earning an annual compensation of $70,000. This has now all been lost because of the Defendants' retaliation.

112. Critically, Dr. Gopalan was never informed about the termination of the grant by the Defendants despite the entirety of the grant being the product of Gopalan's work. He received no notice or opportunity to be heard before or after termination of the grant.

113. In March 2026, Gopalan learned that Defendants had written to the US Department of Education on or about January 6, 2025 asking for the grant to be terminated.

114. Gopalan had property and liberty rights in his $4.68 million grant. His property rights and liberty interests were deprived not only without due process but with absolutely no process at all.

## Part IV. Causes of Action

### COUNT I. DEFENDANTS KNOWINGLY PRESENTED FALSE OR FRAUDULENT CLAIMS FOR PAYMENT TO THE UNITED STATES IN VIOLATION OF THE FALSE CLAIMS ACT, 31 USC § 3729.

115. Relator re-alleges and incorporates all the allegations above.

116. To obtain and retain eligibility for Title IV, HEA funds, Defendants entered into and operated under Program Participation Agreements (PPA) by which they expressly certified compliance with all Title IV statutory and regulatory requirements, including the enrollment-integrity, attendance-tracking, return-of-funds, and accurate-reporting obligations set forth in 20 U.S.C. §§ 1092, 1094 and 34 C.F.R. §§ 668.14, 668.21–668.24, 685.305.

117. Each request for Title IV disbursement, and each draw on federal funds keyed to reported enrollment, constituted a claim within the meaning of 31 U.S.C. § 3729(b)(2).

118. Those claims were false. Defendants knowingly reported inflated enrollment to the Department of Education through IPEDS and related submissions for award years 2020 through 2026; enrolled unqualified "phantom" and "Summer Bridge" students who did not satisfy admission or attendance requirements; disabled attendance tracking and hard-coded an "attended" status to defeat the federally required dropping of non-attending students; operated duplicate "independent study" enrollments and a sham "Testing Center" to conceal non-attendance and academic ineligibility; and failed to perform the return-of-funds calculations the regulations require.

119. Defendants acted knowingly, as defined in 31 U.S.C. § 3729(b)(1), including through the deliberate disabling of attendance tracking, the refusal to drop non-attending students despite faculty notification, and the September 2024 transfer of funds to make approximately 800 non-attending, non-paying students appear enrolled.

120. The enrollment-integrity requirements were material to the Government's payment decisions within the meaning of *Universal Health Services, Inc. v. United States ex rel. Escobar,* 579 U.S. 176 (2016): they are express conditions of Title IV participation and payment, the Government would not have paid had it known of the violations, and the funding and oversight agencies treated compliance as material, as evidenced by the notices of non-compliance issued to UMES.

121. The United States unaware of the falsity of the claims, and/or statements made by Defendants, and in the reliance on the accuracy thereof, paid Defendants for such false or fraudulent claims.

122. By reason of the acts and conduct of the Defendants in violation of 31 USC §3729(a)(1), the United States has suffered actual damages, including the amounts paid in response to, all such fraudulent claims for payment.

123. By reasons of Defendants failure to properly oversee the use of HEA funds, the United States government was paying for unused or fraudulent services.

124. The United States is entitled to recover civil money penalties, and any and all other monetary and equitable relief, as deemed appropriate by this Court.

### COUNT II — FALSE CERTIFICATION OF CIVIL-RIGHTS COMPLIANCE (TITLE VI, TITLE IX, AND USDA ASSURANCES), 31 U.S.C. § 3729(A)(1)(A) & (B)

125. Relator re-alleges and incorporates all the allegations above.

126. As a condition of receiving federal financial assistance, Defendants were required to, and did, expressly certify compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (prohibiting race, color, and national-origin discrimination in federally funded programs); Title IX of the Education Amendments of 1972, 20 U.S.C.

§ 1681 et seq.; as a Land-Grant institution, the civil-rights assurances of USDA Form AD-1023; and Assurances of Compliance in SF-424 and SF424-B. Defendant Anderson personally executed or authorized these certifications.

127. These certifications were conditions of the receipt and retention of federal funds. By certifying compliance, Defendants represented that UMES operated its federally funded programs without unlawful discrimination on the basis of race, color, or national origin.

128. Those certifications were knowingly false. Defendants implemented and maintained an express race-based enrollment practice designed to ensure that approximately 80% of students were Black, recruited and enrolled by race a cohort of unqualified "Summer Bridge" students each year, systematically excluded White and Asian employees from senior positions, transferred grants and work product on the basis of race, administered employee discipline selectively on the basis of race, and discriminated on the basis of sex, national origin, and race against the Relator and others. These practices violated the very civil-rights laws Defendants certified they were obeying.

129. Defendants knew the certifications were false, or acted in deliberate ignorance or reckless disregard of their falsity, within the meaning of 31 U.S.C. § 3729(b)(1). The discriminatory practices were designed and directed at the institution's highest levels, and the Relator specifically reported the discrimination to Defendants and to federal and state authorities before and during the relevant period.

130. The civil-rights certifications were material to the Government's payment decisions within the meaning of *Escobar*. Compliance with Title VI, Title IX, and the USDA assurances is an express condition of federal financial assistance; the Government conditions funding on these certifications precisely because it regards non-discrimination as essential; and the Government would not have paid, or would have been entitled to refuse payment, had it known the certifications were false.

131. Each claim for federal funds submitted while these false civil-rights certifications were in effect, and each false certification that caused federal funds to be paid or retained, constitutes a false or fraudulent claim under 31 U.S.C. § 3729(a)(1)(A), and the making or use of each false certification to get a claim paid violates § 3729(a)(1)(B).

132. The United States is entitled to treble damages and a civil penalty for each violation at the statutory range then in effect.

## COUNT III. MAKING OR USING FALSE RECORD OR STATEMENT TO CAUSE CLAIM TO BE PAID. 31 USC §3729(a)(2)

133. Relator re-alleges and incorporates all the allegations above.

134. . Defendants knowingly made, used, or caused to be made or used, false records and statements material to false or fraudulent claims for federal funds — including the inflated IPEDS enrollment submissions; the PPA recertifications of Title IV compliance; the annual compliance audits and financial statements required by 20 U.S.C. § 1094(c) and 34 C.F.R. §§ 668.23, 668.25; the civil-rights certifications described in Count II; and the records falsely reflecting attendance, grades, and the existence of "independent study" and "Testing Center" coursework. Each such record

or statement was material to the Government's decision to pay or approve claims, within the meaning of *Escobar* and 31 U.S.C. § 3729(b)(4).

135. The United States unaware of the falsity of the claims, and/or statements made by Defendants, and in the reliance on the accuracy thereof, paid Defendants for such false or fraudulent claims.

136. By virtue of the false records or false statements made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus any civil penalties for each violation.

**COUNT IV — REVERSE FALSE CLAIMS (CONCEALMENT AND AVOIDANCE OF AN OBLIGATION TO REPAY), 31 U.S.C. § 3729(A)(1)(G).**

137. Relator re-alleges and incorporates all the allegations above.

138. Upon enrolling phantom and unqualified students, failing to drop non-attending students, misappropriating the Department of Commerce iPad grant, and misusing Title III funds, Defendants incurred an obligation to repay or return federal funds to the United States within the meaning of 31 U.S.C. §§ 3729(a)(1)(G) and (b)(3).

139. Rather than disclose and repay, Defendants knowingly concealed, and knowingly and improperly avoided, that obligation — including by maintaining false attendance and enrollment records, by failing to perform required return-of-funds calculations, by transferring funds in September 2024 to mask approximately 800 non-attending students, and by retaliating against the Relator who reported the underlying violations instead of investigating and correcting them.

140. By concealing and avoiding an obligation to repay money to the United States, Defendants are liable under 31 U.S.C. § 3729(a)(1)(G) for treble the concealed obligation and per-claim penalties.

## COUNT V. CONSPIRACY TO SUBMIT FALSE CLAIMS.
## 31 USC §3729 (a)(3)

141. Relator/Plaintiff Gopalan re-alleges and incorporates all the allegations above.

142. Defendants and others knowingly agreed and conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G) — including, to present false enrollment-based and civil-rights-based claims, to make and use false records material to those claims, and to conceal and avoid the obligation to repay federal funds. Defendants took overt acts in furtherance of the conspiracy, including the design and operation of the Summer Bridge, phantom-student, duplicate-enrollment, Testing-Center, and fake-course schemes; the disabling of attendance tracking; the IPEDS misreporting; the false civil-rights and PPA certifications; the diversion of the iPad grant; and the September 2024 transfer of funds to conceal non-attending students.

143. The United States unaware of the falsity of the claims, and/or statements made by Defendants, and in the reliance on the accuracy thereof, paid Defendants for such false or fraudulent claims.

144. The United States unaware of the Defendants' conspiracies or the steps taken in furtherance thereof, allowed, paid or participated in payments to Defendants that would otherwise not have been allowed or paid but for Defendants' conduct.

145. By virtue of Defendants' conduct, the United States was damaged, and continues to be damaged, in an amount to be determined, and is entitled to any and all other relief under the FCA.

**COUNT VI. RETALIATION UNDER THE FALSE CLAIMS ACT, 31 USC §3730(h)**

146. Relator re-alleges by reference all the allegations above.

147. The Relator engaged in protected activity under 31 U.S.C. § 3730(h) by investigating, objecting to, and reporting conduct he reasonably believed constituted violations of the False Claims Act — including the enrollment-integrity fraud, the false civil-rights certifications, the iPad-grant diversion, and the Title III misuse — to Defendants and to federal and state authorities in June, September, and December 2024 and throughout 2025.

148. Defendants knew of the Relator's protected activity. Anderson stated that she had been alerted to a whistleblower complaint and, in a one-on-one meeting with Gopalan only, indicated she knew who had authored it; the institution's own communications and inferences from it, reflect awareness of the Relator's complaints, and Defendants' knowledge of Gopalan's protected activities.

149. Defendants retaliated against the Relator because of that protected activity, including by terminating his $4,680,568 federal grant without notice or process, shutting down the Futures Institute, cancelling the funded students' admissions and assistantships, assigning him the worst available office, initiating a pretextual misconduct investigation, demoting him with a salary reduction of approximately $150,000, and recommending termination of his tenure.

150. The retaliation occurred notwithstanding that the U.S. Department of Education had advised the Defendants, in writing, that the Futures Institute grant had not been terminated and directed that it be restored — confirming that the termination served Defendants' retaliatory purpose rather than any legitimate basis.

151. The Relator is entitled to all relief available under 31 U.S.C. § 3730(h), including two times the amount of back pay, interest, reinstatement (or front pay), special damages, and attorney's fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff/Relator, Sandeep Gopalan, acting on behalf of and in the name of the United States of America requests that judgment be entered against the Defendants, ordering that:

a. Defendants cease and desist from violating 31 USC §3729 et seq.,

b. A civil penalty for each false claim within the current statutory range of $14,308 to $28,619 per claim (for violations after November 2, 2015), as adjusted annually.

c. The maximum relator's share permitted under 31 U.S.C. § 3730(d).

d. Treble damages or two times back pay, interest, reinstatement or front pay, special damages, and attorney's fees and costs under § 3730(h), and that the,

e. The United States and Relator be granted all and any other such relief, as this Court deems just and proper under all the laws of the United States and this Court.

## **JURY DEMAND**

Plaintiff requests a jury trial on all counts.

*Respectfully Submitted,*

Dhali PC

/s/A.J Dhali, Esq.

Federal Bar No. 18631

1629 K. Street. NW. Suite 300.

Washington D.C. 20006

Telephone: (202) 556-1285

Facsimile: (202) 351-0518

ajdhali@dhalilaw.com

Friday 6/19/2026

Attorney for Sandeep Gopalan Relator/Plaintiff